UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

                                                       Case No. 8-17-77330-las

SUSAN LAURA LEVIN
AKA SUSAN L. LEVIN,

                                                       Chapter 7

                                      Debtor.
------------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER

Before the Court is the motion of Susan Laura Levin ("Debtor") to avoid the judicial lien held by Alex Astilean ("Astilean") on the Debtor's residential real property located at 10 Wagon Lane, East Hampton, New York ("Property") pursuant to 11 U.S.C. § 522(f).[1] [dkt. no. 38]. Astilean opposed the motion [dkt. no. 39], and the Debtor replied [dkt. no. 42]. The heart of this dispute is not whether Astilean holds a valid judicial lien against the Property, but rather, the parties' disagreement as to the value of the Property.

The Court has subject matter jurisdiction under 28 U.S.C. § 1334(b) and the Standing Order of Reference entered by the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 157(a), dated August 28, 1986, as amended by Order dated December 5, 2012.

The Court conducted an evidentiary hearing at which Debtor's appraiser testified and Astilean, acting *pro se*,[2] cross-examined the appraiser. The Court observed the demeanor and testimony of the witness carefully, and has reviewed thoroughly the evidence presented and the parties' pre-hearing submissions. This Memorandum Decision and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of

---

[1] All statutory references to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, will hereinafter be referred to as "§ (section number)".

[2] Astilean was initially represented by counsel. Counsel move to withdraw [dkt. no. 63]. Astilean did not oppose the motion, and an order authorizing counsel to withdraw was entered by the Court [dkt. no. 70].

Civil Procedure, made applicable to this contested matter by Bankruptcy Rules 9014 and 7052. To the extent a finding of fact includes a conclusion of law, it is deemed a conclusion of law, and vice versa.

For the reasons set forth below, the Court finds that the Debtor has not met her burden of establishing that the judicial lien should be avoided in its entirety. Rather, based on the record before the Court, the judicial lien shall be avoided in part. The judicial lien shall remain a lien on the Property in the amount of $42,424.00.

I.      Background

Debtor filed for chapter 7 relief on November 28, 2017 ("Petition Date"). As of the Petition Date, the Property was encumbered by (i) a mortgage lien held by Eastern Savings Bank ("Eastern") with an outstanding balance of $725,207, and (ii) Federal and New York state tax liens totaling $87,598.21 and $28,420.79 respectively. Although the Debtor claimed a homestead exemption under § 522(b) of $150,000 on her Schedule C (exemptions) to the bankruptcy petition under N.Y. CPLR § 5206(a), she is entitled to claim a maximum of $165,550[3] for her homestead exemption.

Astilean has a prepetition judgment against the Debtor in the amount of $97,109.30, which judgment was docketed in the Office of the Suffolk County Clerk against the Property. Debtor seeks to avoid Astilean's judicial lien pursuant to § 522(f)(2) asserting that the judicial lien impairs her homestead exemption. Astilean contends that debtor's homestead exemption is not impaired because the appraisal upon which the Debtor relies in her § 522(f) calculation undervalues the Property and there is sufficient non-exempt equity to pay his judgment lien. Thus, the Court is tasked with determining the value of the Property.

---

[3] At the time the Debtor filed her bankruptcy petition, the New York homestead exemption for property in Suffolk County was $165,550. That amount has since increased to $170,825.

II.     Legal Standard and Analysis

A.  Avoidance of Judicial Lien

Under § 522(b)(1), an individual debtor is permitted to exempt certain property from the bankruptcy estate.[4] If properly claimed, exempt property is not available to pay the claims of certain creditors during the bankruptcy case and, with limited exceptions, after the bankruptcy case as well. See 11 U.S.C. § 522(c). In turn, § 522(f) permits a debtor to "avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section." 11 U.S.C. § 522(f). A debtor must demonstrate, by a preponderance of the evidence,[5] that: (1) the debtor is entitled to an exemption under § 522(b); (2) the property is listed on the debtor's schedules and claimed as exempt, (3) the lien must impair that exemption, and (4) the lien must be a judicial lien. *In re Schneider*, No. 12-77005-ast, No. 13-70791-ast, 2013 WL 5979756, at *6 (Bankr. E.D.N.Y. Nov. 8, 2013).  See also *In re Goswami*, 304 B.R. 386, 390-91 (B.A.P. 9th Cir. 2003)).

Section 522(f) sets forth a mathematical formula that a lien impairs an exemption to the extent that "the sum of all liens on the property, including the lien under consideration, together with the value that the debtor could claim as exempt in the absence of liens on the property, exceed the value of the debtor's interest in the property if it were totally

---

[4] Section 522(b)(1) provides that an individual debtor may exempt what is allowed under applicable state exemption laws plus certain additional exemptions, see 11 U.S.C. § 522(b)(3), or what is allowed under the federal exemptions unless applicable state law precludes its residents from claiming the federal exemptions listed under § 522(d), see 11 U.S.C. § 522(b)(2).

[5] "The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence . . . ." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137, n.9 (1997) (quoting *Concrete Pipe and Prods. of Cal., Inc. v Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993). "As the finder of fact, the Court is entitled to make credibility findings of the witnesses and testimony."  *Merck Eprova AG v. Gnosis S.P.A.*, 901 F. Supp. 2d 436, 448 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014).

unencumbered." *In re Gucciardo*, 576 B.R. 297, 299 (Bankr. E.D.N.Y. 2017) (quoting *In re Armenakis*, 406 B.R. 589, 617 (Bankr. S.D.N.Y. 2009)). In other words, a judicial lien may be avoided to the extent the sum of all liens, consensual and nonconsensual, on the property and the exemption exceed the value of the debtor's interest in the property.  *In re Gucciardo*, 576 B.R. at 300.

Here, there is no dispute that (i) Debtor is entitled to a $165,550 homestead exemption pursuant to § 522(b)(3) and N.Y. CPLR § 5206(a), (ii) Debtor disclosed the Property on her bankruptcy schedules and claimed a homestead exemption on her Schedule C, and (iii) Astilean's lien is a judicial lien against the Property. Whether Astilean's judicial lien impairs the Debtor's homestead exemption, in whole or in part, depends on the value of the Property. Under the mathematical formula, Astilean's judicial lien would be avoided in full, if the Court finds the value of the Property to be $1,006,776 or less, but the lien would be preserved in full if the Court finds the Property to be worth approximately $1,103,885 or more. Any value in between would result in a partial reduction of Astilean's judicial lien proportionately.

1.    Valuation of Property

In a chapter 7 case, exempt property is valued as of the petition date. *In re Levinson*, 372 B.R. 582, 586 (Bankr. E.D.N.Y. 2007), *aff'd*, 395 B.R. 554 (E.D.N.Y. 2008); *In re Wilding*, 475 F.3d 428, 432 (1st Cir. 2007). For purposes of § 522, the Bankruptcy Code defines "value" as the fair market value as of the date of the filing of the petition or the date the property becomes property of the estate if the property was acquired or generated post-petition. 11 U.S.C. § 522(a)(2).

Courts have consistently held that valuation is "not an exact science." *Karakas v. Bank of N.Y.* (*In re Karakas*), Bankr. No. 06-32961, Adv. No. 06-80245, 2007 WL 1307906, at *5 (Bankr. N.D.N.Y. May 3, 2007). "Any judicial determination of fair market value of real estate is, at most, a fixing of a hypothetical price 'at which [the real estate] would change

4

hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.'" *Ellis v. U.S. Bank. Nat'l Ass'n (In re Ellis)*, Case No.: 16-30870 (AMN), 2017 WL 3822018, at \*4 (Bankr. D. Conn. Aug. 28, 2017) (quoting *World Trade Ctr. Props. LLC v. American Airlines, Inc. (In re Sept. 11. Litig.)*, 802 F.3d 314, 355 (2d Cir. 2015)).

> Valuation outside the actual market place is inherently inexact. Because of the subjective nature of the appraisal process, courts are given wide latitude in determining value. A court is not bound by the values determined by appraisals but rather may form its own opinion as to the value of the subject property after the consideration of the appraisers' testimony and their appraisals. Moreover, because the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses.

*Wright v. Chase (In re Wright)*, 460 B.R. 581, 584 (Bankr. E.D.N.Y. 2011) (citations and quotations omitted). See also *In re Pod*, 560 560 B.R. 77, 80 (Bankr. E.D.N.Y. 2016); *In re Ricci-Breen*, Case No. 14-22798 (RDD), 2015 WL 5156617, at \*6 (Bankr. S.D.N.Y. Aug. 31, 2015).

In valuing residential real property, the typical method used is the comparable sales method. In analyzing comparable sales relied upon in appraisals, courts give more weight to sales that took place no more than 6 months prepetition and 3 months post-petition. *Pod*, 560 B.R. at 84 (finding that if the bank's appraisal, which was effective approximately 6 months after the petition date, had an effective date of the petition date, then the comparable sale which closed post-petition would have been excluded); *Richards v. Community Choice Credit Union (In re Richards)*, 501 B.R. 326, 331 (Bankr. E.D. Mich. 2013) (disregarding comparable sales which closed 7 months or more prior to the petition date); *In Seidle v. Sovereign Bank (In re Seidle)*, Bankr. No. 1:10-bk-01645MDF, Adv. No. 1:10-ap-00354MDF, 2013 WL 828303, at \*3 (Bankr. M.D. Pa. Mar. 6, 2013) (noting that comparable sales 6 months before the

valuation date are generally regarded as the most reliable indicators of value and finding the bank's appraisal, which contained comparable sales more closely related in time to the date of the appraisal, to be more persuasive even though the court did consider the debtor's appraisal which was dated 7 months post-petition); *In re Duncan*, No. 08-8808AJM3, 2008 WL 5333561, at \*3 (Bankr. S.D. Ind. Dec. 17, 2008) (noting that normally comparable sales over a year old should not be used).

In addition to the timing of comparable sales, courts also consider other factors such as location, lot size, square footage, condition, and age of the property. *Toal v. Chase Home Finance LLC (In re Toal)*, Bankr. No. 10-72783-478, Adv. No. 10-8613-478, 2011 WL 3607911, at \*3 (Bankr. E.D.N.Y. Aug. 15, 2011). See also *Rowe v. Krekeler (In re Rowe)*, Case No.: 17-10305-13, Adv. No.: 17-17, 2018 WL 539779, at \*3 (Bankr. W.D. Wis. Jan. 23, 2018) (noting that the age, deferred maintenance and location are all factors that affect the value of property). The greater the distance the comparable sales are from the subject property, the less indicative they are as to the value because "a property located two to three miles away may have different access to amenities or facilities, and different neighborhood characteristics." *Ellis*, Case No.: 16-30870 (AMN), 2017 WL 3822018, at \*5. "The preferred location for comparable properties is the immediate neighborhood or subdivision where the subject is located." *In re Toal*, Bankr. No. 10-72783-478, Adv. No. 10-8613-478, 2011 WL 3607911, at \*4 (quoting *In re Jones*, No. 03-84129, 2004 Bankr. LEXIS 143, at \*6 (Bankr. C.D. Ill. Feb. 5, 2004)).

"When two appraisals conflict, a court should carefully compare 'the logic of their analyses' and 'the persuasiveness of their subjective reasoning.'" *In re Hassan*, No. 14-73711-reg, 2015 WL 5895481, at \*5 (Bankr. E.D.N.Y. Oct. 8, 2015) (quoting *In re Park Ave. Partners Ltd. P'ship*, 95 B.R. 605, 610 (Bankr. E.D. Wis. 1988)). "What matters is not the mere

existence of widely varying appraisals, but rather the *reasons* for those variations." *In re Bate Land & Timber, LLC*, 523 B.R. 483, 499 (Bankr. E.D.N.C. 2015) (emphasis in original). However, "where there is a significant difference in value between a debtor's appraisal of a property and the secured creditor's appraisal of a property, the accuracy of the debtor's appraisal is called into question." *Pod*, 560 B.R. at 82 (citing *In re Robinson*, Bk. No. 14-11559-BAH, 2015 WL 5309513 (Bankr. D.N.H. Sept. 10, 2015) and *Hernandez v. TCF Banking & Savings (In re Hernandez)*, 493 B.R. 46, 51 (Bankr. N.D. Ill. 2003)). See also *Gucciardo*, 576 B.R. at 300. "Although no appraisal is perfect, courts have recognized that more deficiencies in one appraisal adversely affect its reliability when compared to another appraisal also shown to have deficiencies." *Pod*, 560 B.R. at 83 (citing *In re Robertson*, 135 B.R. 350, 353 (Bankr. E.D. Ark. 1992)).

### 2.    Appraisals Submitted by the Debtor

The Court conducted a valuation hearing where the parties were given an opportunity to obtain and submit an independent appraisal or valuation of the Property in advance of the hearing. Notwithstanding multiple opportunities to do so prior to the hearing, Astilean did not submit any such appraisal into evidence.[6] Debtor submitted two appraisals prepared by Clifford Troyansky ("Troyansky"), the owner of Long Island Real Estate Appraisal Services Inc., and both appraisals were admitted into evidence. The first appraisal was prepared at the Debtor's request on January 31, 2018 and valued the Property at $1,000,000 as of July 1, 2017 ("Debtor's Appraisal"). The second appraisal was completed earlier on November 22, 2017 on behalf of Eastern which valued the Property at $1,160,000 at that time ("Eastern

---

[6] Astilean previously submitted, through prior counsel, an internet valuation or "Zestimate" from Zillow.com in his opposition to the Debtor's motion. [dkt. no. 39]. The Court declined to allow a Zillow valuation because internet valuations have been found to be inherently unreliable. *In re Darosa*, 442 B.R. 173, 177 (Bankr. D. Mass. 2010); *In re Cocreham*, No. 13-26465-A-13J, 2013 WL 4510694, at *3 (Bankr. E.D. Cal. Aug. 23, 2013) (finding reports such as Zillow are not compilations made admissible by Fed. R. Evid. 803(17)); *In re Tabor*, 583 B.R. 155, 169 (Bankr. N.D. Ill. 2018).

7

Appraisal")[7]. Troyansky was hired by the Debtor to perform an appraisal of the Property after he had competed the Eastern Appraisal but Troyansky was instructed to value the Property as of July 1, 2017, a date arbitrarily chosen by the Debtor. Troyansky testified that there was no change in market conditions between July 2017 and November 2017 that would have affected the value of the Property. Rather, he attributed the difference in valuations between the appraisals to the fact that the Eastern Appraisal was an exterior-only appraisal while the Debtor's Appraisal reflected an interior inspection of the Property.

Before the Court discusses the comparable sales used in the appraisals, the Court notes that in Astilean's cross-examination of Troyansky, Astilean questioned why the appraiser did not utilize comparable properties located on the same street as the Property that were listed for sale.  Troyansky testified that he was not aware of any sale that closed on the same street, but he did include four other properties within the same subdivision in his comparable sales. While properties listed on the same street would provide a more accurate sense of value, assuming the properties have similar features and are of similar size, the Court finds that active listings of properties cannot be considered as the listing price is simply the asking price by the proposed seller. Until a listing closes with a final purchase price, the listing price is simply a speculative estimate of what a seller believes the property is worth but not what an actual buyer agreed to pay. *In re Quevedo*, No.: 1:14-BK-15563-MB, 2015 WL 6150602, at *7 (Bankr. C.D. Cal. Oct. 19, 2015) (declining to consider a comparable that has not yet closed on the basis that closed sales are a more reliable indication of value than a proposed sale that has yet to close). Because Comparable Sale no. 6  in the Eastern

---

[7] The Eastern Appraisal was used by Eastern for its motion seeking relief from the automatic stay with respect to its mortgage lien against the Property. Eastern's stay relief motion has been adjourned pending the outcome of the Debtor's lien avoidance motion.

Appraisal is an active listing the Court will not consider this property in its valuation. This leaves five comparable sales in the Eastern Appraisal for the Court to consider.

As for the comparable sales used by Troyansky, the primary purpose of the Debtor's Appraisal was to account for the conditions uncovered in the inspection of the interior of the Property — not to conduct an entirely new appraisal. Yet, it is difficult to comprehend how adjustments simply to reflect the interior condition of the Property would result in a change in value between the two appraisals by as much as $160,000. The Court finds that the vast difference between the two valuations is attributed to the different comparable sales used in each appraisal and the adjustments made, and not simply due to an interior inspection.

Because Troyansky testified that there was no significant change in market conditions between July and November 2017, one would have expected that the comparable sales used in the Debtor's Appraisal would be substantially the same as those used in the Eastern Appraisal, adjusted only for the interior condition of the Property. Yet, it is apparent that except for two comparable sales used in both appraisals, Troyansky used almost a completely different set of comparable sales in the Debtor's Appraisal from the set used in the Eastern Appraisal. The comparable sales used in the Eastern Appraisal had actual sale prices ranging from $1,100,000 to $1,605,000 and resulted in adjusted valuations from $1,121,500 to $1,269,500 for the Property. The Debtor's Appraisal used comparable sales which had actual sale prices ranging from $850,000 to $1,314,444 and resulted in lower adjusted valuation of $934,000 to $1,150,000 for the Property. Unlike the typical case where there are competing appraisals from a debtor and the creditor, here the Court has two competing appraisals from the same party from which the Court must determine the appropriate value of the Property.

In terms of proximity to the Property, both appraisals contained comparable sales more than one mile away. Of the nine comparable sales used in the Debtor's Appraisal, three are more than one mile from the Property:

9

> Comparable Sale No. 1 (26 Bucks Path) is 2.44 miles
> Comparable Sale No. 3 (6 Cedar Trail) is 1.19 miles
> Comparable Sale No. 6 (17 Shorewood Drive) is 2.53 miles

Similarly, two of the remaining five comparable sales in the Eastern Appraisal are also more than one mile from the Property:

> Comparable Sale No. 3 (18 Shorewood Drive) is 2.58 miles
> Comparable Sale No. 4 (12 N. Hollow Drive) is 4.5 miles

Accordingly, the Court will exclude these comparable sales as these properties are outside of the Property's subdivision.

Although Troyansky testified that there was no change in the market between the dates of the two appraisals (i.e, July 2017 to November 2017), that cannot be said for comparable sales that occur outside of the usual precedential look back period of 6 months prepetition and more than 3 months post-petition - in other words, sales that occurred before June 2017 and after January 2018. The further the sale dates are from the Petition Date, the less reliable the sales are as indicators of the Property's value. The preferred approach is to use comparable sales closer in time to the Petition Date, if available.

Of the Eastern Appraisal, this would result in Comparable Sale No. 5 (15 Anvil Court) being excluded as the property was sold in April 2017 for $1,605,000 and which would result in an adjusted value of $1,269,000 for the Property.  The Anvil property is also at the highest range of the sale prices which makes it somewhat of an outlier. This leaves only 2 properties in the Eastern Appraisal – Comparable Sale No. 1 (12 Cutter Court) and Comparable Sale No. 2 (14 Livery Lane), which the Court can consider. Both properties were sold in August and September 2017, respectively, which occurred within 4 months of the Petition Date. These two properties are located within a quarter mile from the Property, are in the same subdivision as the Property and are also used by Troyansky in the Debtor's Appraisal. Thus, these two properties are the best comparable sales available for the Court to consider.

With respect to the Debtor's Appraisal, Comparable Sale No. 4 (8 Sulky Circle) is excluded as it was sold in August 2015, more than 2 years before the Petition Date. The length of time between the sale date and the Petition Date is also an additional basis for excluding from the Debtor's Appraisal the following comparable sales, which have previously been excluded due to distance from the Property:

Comparable Sale No. 1 (26 Bucks Path)          sold November 2016
Comparable Sale No. 3 (6 Cedar Trail)           sold March 2017
Comparable Sale No. 6 (17 Shorewood Drive)      sold December 2016

This leaves only five comparable sales from the Debtor's Appraisal for the Court to consider. In addition to 12 Cutter Court (Comparable Sale No. 7) and 14 Livery Lane (Comparable Sale No. 5), which were used in the Eastern Appraisal, the remaining comparable sales to consider are Comparable Sale No. 2 (18 Towhee Trail), Comparable Sale No. 8 (14 Towhee Trial) and Comparable Sale No. 9 (8 Cutter Court). Comparable Sale No. 9 (8 Cutter Court) was sold in January 2018. Although this property was sold post-petition, it is still relatively close in time to the Petition Date to be considered.

When considering these comparable sales as used in each appraisal, the Court must examine the reasonableness of the adjustments made to each of the comparable sales. This task is challenging even though the same appraiser inspected the Property and prepared the appraisals because, in essence, Troyansky prepared an entirely new valuation for the Debtor with mostly different comparable sale properties and, even where the same properties were used in both appraisals, there are discrepancies.

This is highlighted by the fact that both appraisals use 12 Cutter Court[8], which sold for $1,314,444 in August of 2017, and 14 Livery Lane[9], which sold for $1,275,000 in

---

[8] Comparable Sale No. 1 on the Eastern Appraisal; Comparable Sale No. 7 on the Debtor's Appraisal.

[9] Comparable Sale No. 2 on the Eastern Appraisal; Comparable Sale No. 5 on the Debtor's Appraisal.

September of 2017. These sales closed within 2-3 months prior to the Petition Date and, as discussed, are within the same subdivision as the Property. After various adjustments to the sales price of 12 Cutter Court and 14 Livery Lane, Troyansky arrived at a value for the Property in the Eastern Appraisal, which was an exterior only appraisal, of $1,143,444 and $1,133,000, respectively. One would expect that if the only difference between the two appraisals was to adjust for the dated interior condition of the Property, there should be a downward adjustment in the Debtor's Appraisal from the $1,143,444 and $1,133,000 values assigned to the Property in the Eastern Appraisal. Yet, after factoring in the interior of the Property and making various adjustments to the sale price for 12 Cutter Court and 14 Livery Lane, Troyansky ended up with values of $1,148,000 and $1,150,000, respectively, for the Property in the Debtor's Appraisal. Thus, the value of the Property increased in value from the Eastern Appraisal to the Debtor's Appraisal notwithstanding the supposedly less than average condition of the interior of the Property.

The differences in value are due to the adjustments made for 12 Cutter Court and 14 Livery Lane in each appraisal. While the negative adjustments for the number of bathrooms and garage space remain unchanged between the two appraisals, Troyansky did not make any downward adjustments (in the amount of $5,000) for heating/cooling systems for either properties in the Debtor's appraisal as he did in the Eastern Appraisal. Presumably, this meant that, after the interior inspection, Troyansky concluded that the Property had a heating/cooling system similar to those in the comparable sale properties, and no downward adjustment for this factor was necessary.

As for the 14 Livery Lane property, Troyansky did not make any adjustments based upon the interior condition of the Property in either appraisal. Rather, the only changes were in the reduction of the amount of the downward adjustment from $34,500 in the Eastern Appraisal to $21,000 in the Debtor's Appraisal to account for 14 Livery Lane having 1.02

12

acres of land and the Property having 0.74 acres, and a slightly larger downward adjustment of $56,500 in the gross living space in the Debtor's Appraisal as opposed to the $55,000 adjustment made in the Eastern Appraisal.

As for the 12 Cutter Court property, in the Eastern Appraisal, Troyansky made a $65,500 downward adjustment for the quality of construction and another $65,500 downward adjustment for the condition of the Property. Yet, in the Debtor's Appraisal, Troyansky made no adjustment for design or construction, but took a $131,444 deduction for 12 Cutter Court's superior condition vis-à-vis the Property because 12 Cutter Court was renovated. As discussed above, after inspecting the interior of the Property, Troyansky's overall downward adjustments for the sale prices of 14 Livery Lane and 12 Cutter Court were 1.3% and 0.3% less in the Debtor's Appraisal than the downward adjustments made in the Eastern Appraisal, thus resulting in an unintended higher average valuation for the Property of $1,149,000 in the Debtor's Appraisal, as opposed to the average value of $1,138,222 in the Eastern Appraisal. There was no testimony from Troyansky regarding such discrepancies between the appraisals when the same comparable sale properties were used. If the purpose of the Debtor's Appraisal was solely to adjust the valuation downward for the interior condition of the Property, such as discounting for needed repairs which Troyansky estimated in the Debtor's Appraisal to cost approximately $50,000, then the Debtor's Appraisal did not accomplish that goal. Rather, the discrepancies between the Eastern Appraisal and the Debtor's Appraisal raises questions about the methodology and the adjustments made in both appraisals. Given that the Debtor is advocating that the Debtor's Appraisal is the more accurate appraisal and it is the Debtor's burden of proof as to valuation, the Court will consider the comparable sale values for 12 Cutter Court and 14 Livery Lane as contained in the Debtor's Appraisal as opposed to the values in the Eastern Appraisal in its analysis.

The Debtor's Appraisal includes two other properties located within 0.50 miles of the Property, Comparable Sale No. 8 (14 Towhee Trail) and Comparable Sale No. 2 (18 Towhee Trail), which were sold in July and June of 2017, respectively, within 5 months of the Petition Date. These properties were chosen due to their proximity and the sale dates occurring close to the July 1, 2017 valuation date. The sale prices for the Towhee Trail properties are $940,000 and $850,000, respectively, which are much lower than the sale prices for 14 Livery Lane and 12 Cutter Court. Both of the Towhee Trail properties have a smaller lot size of half an acre compared to the Property's three-quarters of an acre. 18 Towhee Trail is listed as a cape style home, and the other comparable sales and the Property are listed as contemporary, although no adjustments were made to account for the difference in style. After adjustments to the Towhee Trail properties, Troyanksy arrived at comparable values of $934,000 and $954,500 for the Property.

The last remaining property in the Debtor's Appraisal is Comparable Sale No. 9 (8 Cutter Court), which is within the same subdivision as the Property. Although the sale of 8 Cutter Court closed at $1,130,000 in January of 2018, two months after the Petition Date, the sale is still relatively close in time to be considered. Of all the properties, 8 Cutter Court is closest in features and amenities to the Property and most similar in terms of age, location, and lot size. The only adjustments made were for more gross living area in terms of an extra bedroom and bathroom, and slightly better condition of the comparable sale property. After adjustments, Troyansky arrived at a valuation of $1,059,500 for the Property.

When the Court averages the adjusted values for the five comparable sales discussed above in the Debtor's Appraisal, the Court finds the fair market value of the Property to be $1,049,200.

Accordingly, the calculations for the mathematical formula under § 522(f) is as follows:

| | |
|---|---|
| Value of the Property absent liens | $1,049,200.00 |
| Less mortgage | ($  725,207.00) |
| Less Federal tax liens | ($    87,598.21) |
| Less New York State tax liens | ($    28,420.79) |
| Less maximum exemption allowable | ($  165,550.00) |
| Less Astilean's judicial lien | ($    97,109.30) |
| Impairment | ($    54,685.30) |

Astilean's judicial lien may, therefore, be avoided in part. It is avoided to the extent it impairs the debtor's homestead exemption, i.e. $54,685.30, and shall remain a judicial lien on the Property in the amount of $42,424.00.

III.    Conclusion

For the foregoing reasons, the Court finds that Astilean's judicial lien impairs the Debtor's homestead exemption to the extent of $54,685.30, and the judicial lien shall be avoided in that amount pursuant to § 522(f). A separate order will be entered by the Court reducing the amount of Astilean's judicial lien to $42,424.00.

So ordered.

**Dated: April 24, 2020**
**Central Islip, New York**

**Louis A. Scarcella**
**United States Bankruptcy Judge**